# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-3602

_____

United States of America

*Plaintiff - Appellee*

v.

James Vernon McKnight

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 23, 2016
Filed: October 31, 2016
[Unpublished]

_____

Before WOLLMAN, BRIGHT, and KELLY, Circuit Judges.

_____

PER CURIAM.

A jury found James Vernon McKnight guilty of conspiring to possess with intent to distribute, possessing with intent to distribute, and distributing controlled substances and controlled-substance analogues, in violation of 21 U.S.C. §§ 813,

841(a)(1) and (b)(1)(C), and 846. The district court[1] sentenced McKnight to time served—the seven months during which McKnight had been in custody prior to sentencing, three years of supervised release, and a $300 special assessment. McKnight appeals, arguing that the evidence was insufficient to support his convictions. We affirm.

In July 2012, police received information that smokable synthetic cannabinoids, commonly called "K2," "potpourri," or "incense" (K2), were being sold from McKnight's Starstruck Video store in Conway, Arkansas. Acting on the tip, an undercover officer entered the store on July 11 and asked an employee, later identified as McKnight, for "smoke," street terminology for K2. McKnight led the officer to a back office, unlocked a three-drawer toolbox, selected a package of K2 from several options, placed the package in a black DVD case, and accepted $20 for the sale. McKnight did not enter the sale in the cash register or provide the officer a sales receipt. McKnight told the officer that if he returned to the store with the black DVD case, store employees would understand that he had purchased K2 in the past and that he wished to purchase more. Later testing of the contents of the package purchased by the officer revealed that it contained 1.3 grams of AM-2201, a schedule I controlled substance as of July 9, 2012, and a controlled-substance analogue prior to that date.

In August 2012, the undercover officer returned to Starstruck Video with the black DVD case and again asked an employee for "smoke." The employee sold the officer a 1.5-gram package of "Snoopy" brand K2 for $10, explaining that the store had no other K2 brands available for sale because they were illegal. The employee placed the package in the empty DVD case; he did not enter the sale in the cash register or provide a sales receipt. Later testing revealed that the package contained

---

[1]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

1.16 grams of UR-144, a controlled-substance analogue. In September, the officer returned to the store with the black DVD case and again asked for "smoke." Keith Burford, McKnight's business partner, advised the officer that they were out of K2 but were expecting a shipment later that day. After the officer told Burford that he was "just trying to get right," street terminology indicating a desire to get high, Burford motioned the officer into his office and retrieved a cloth bundle, which he unfolded to reveal a gallon-sized plastic bag full of smaller packages of a green substance. Burford told the officer that he manufactured this K2 himself, that he had watched two people get "messed up" after smoking the substance, and that he could provide larger quantities if the officer wanted to sell it to his friends. The officer paid $20 for a 3-gram package of the green substance, and Burford gave the officer another package of what he described as poor quality product free of charge. Burford placed both packages in the officer's DVD case. Later testing revealed that the two packages contained 3.0 grams and 2.4 grams, respectively, of UR-144. The undercover officer returned to Starstruck Video with the black DVD case a final time in October and again asked for "smoke." An employee recommended "Scooby Snax" brand K2 and retrieved a package from under the counter, commenting that other purchasers had given the product good reviews. The officer paid $30 for a 4.0-gram package, which the employee placed in the officer's DVD case. Later testing revealed that the package contained 3.8 grams of a non-controlled substance.

On October 18, 2012, officers executed a search warrant at Starstruck Video, seizing numerous packages of K2; packaging materials, including plastic baggies of various sizes; a grinder; and several empty black DVD cases. Officers also seized supplier invoices, U.S. Postal Service (USPS) Priority Mail packages, and documents identifying Maxwell Mason as a supplier of K2 products. McKnight, who was present during the search, informed the officers that he had been selling K2 products for about five months for $25 to $35 per package, but that he received only a portion of the sales price because he was selling the products on consignment for Mason. Thirteen of the seized K2 packages were tested; eight contained AM-2201, XLR-11,

and UR-144, and five contained non-controlled substances. At that time, AM-2201 was a schedule I controlled substance, and XLR-11 and UR-144 were controlled-substance analogues.[2] A few days after execution of the search warrant, officers intercepted a USPS package addressed to "James" at Starstruck Video. Because they suspected the package would contain additional K2 products, the officers contacted McKnight, relayed their suspicions, and sought his consent to open the package. McKnight denied having ordered any K2 products and agreed to allowing the officers to open the package in his presence. The package contained multiple packets of various K2 products, some of which later tested positive for XLR-11.

On September 11, 2013, a federal grand jury returned an indictment charging McKnight and others with the offenses set forth above. McKnight proceeded to trial, while each of his coconspirators pleaded guilty and agreed to testify against McKnight. In addition to the undercover officer's and lab analysts' testimony, the government offered the testimony of coconspirators Mason, Burford, and Justin Taylor. Mason testified that when he first bought K2 products from McKnight, the products were kept in frozen-food boxes in a freezer in the back office. At some point, Mason began buying K2 products in bulk and arranged with McKnight to sell those products on consignment at Starstruck Video. McKnight recorded sales of Mason's K2 products on a separate ledger page, which was titled "Mason back room stuff." Mason often packaged his K2 products for delivery to McKnight in sealed USPS packages with appropriate postage—even though the packages were never actually mailed through the postal system—because he understood that a warrant was required before officers could open such packages. Mason testified that he attempted to stay informed regarding the legality of the products he was selling, but he admitted to knowing that all of his K2 products were illegal. He stated that McKnight

_____

[2]UR-144 and XLR-11 were temporarily placed into schedule I on May 16, 2013, and that temporary placement became final on May 11, 2016. See Schedules of Controlled Substances: Placement of UR-144, XLR11, and AKB48 into Schedule I, 81 Fed. Reg. 29,142 (May 11, 2016) (to be codified at 21 C.F.R. 1308).

-4-

distributed the K2 products in black DVD cases from under the counter because he was attempting to keep the sales "under the radar." He testified that McKnight originally insisted on having lab reports to confirm the legality of each K2 product sold at Starstruck Video but that they later discussed selling products for which there were no such reports or for which he would simply falsify old lab reports. Mason acknowledged that he knew his customers were buying K2 products to smoke to get high and that he never knew a customer to buy the products for another purpose. He also stated that his K2 products were not for use as aphrodisiacs nor had he ever seen them advertised for such purpose in Starstruck Video. Finally, Mason acknowledged that he delivered K2 products to the store in a manner that was designed to avoid detection, that K2 products were sold from under the counter and packaged in black DVD cases, that he advised Starstruck employees and others to keep the products secret, and that he engaged in these efforts at subterfuge because he understood that his conduct was illegal.

Burford testified that when Starstruck Video began selling K2 products labeled "potpourri," McKnight told him that the product was "synthetic marijuana." Burford also stated that the K2 "potpourri" commanded far higher prices than did the actual potpourri sold at the store. Burford testified that he and McKnight discussed placing some of the K2 "potpourri" in a bowl as if it were actual potpourri in the event that "anything came up," *i.e.*, in the event that law enforcement entered the store. Burford stated that he and McKnight discussed whether the K2 products were legal and that McKnight had obtained information from suppliers regarding the products' legality. Burford admitted, however, that despite these inquiries, McKnight must have known that the K2 products were illegal because they "kept it so secret." Burford admitted that it was his idea to use the black DVD cases to hide the K2 products for purchasers, because he believed that it would look suspicious for the 30-40 customers who bought these products each day to leave the store without evidence of having purchased anything. Burford confirmed that the K2 products were not displayed or available for sale in the adult section of the store, but were instead kept in

McKnight's office. He stated that even though the packages were labeled "potpourri" that was "not for human consumption," he and McKnight both understood that the K2 products were not actually potpourri and that customers were buying the K2 products to smoke to get high.

Taylor testified that in 2012 his roommate purchased K2 products from McKnight at Starstruck Video. Taylor explained that he initially accompanied his roommate to the store until employees became familiar enough with him to sell him K2 products directly. When he began to purchase K2 products himself, he was taken into an office where the K2 products were kept in a locked toolbox. Taylor testified that purchasers bought K2 products to smoke to get high and that no one who purchased the products used them as incense. Taylor understood that Mason shipped K2 products in USPS packages because law enforcement could not search those packages without a warrant. Finally, Taylor testified that Mason told him that the K2 products were illegal but that he never directly discussed the matter with McKnight.

At the close of the government's case-in-chief, McKnight moved for judgment of acquittal, which the district court denied. McKnight then testified, asserting that he sold the K2 products as "incense" and "herbal Viagra," that the K2 products were not intended for human consumption and were so labeled, that they were not meant to be smoked to get high, and that he displayed a disclaimer in the store warning that the K2 products were not for human consumption. McKnight stated that he kept the K2 products under the counter and in a back room because, as with the adult videos and novelties he sold, he wanted to keep them away from underage customers. He instructed his employees to place purchases of K2 products in black DVD cases for discretion and privacy purposes, just as he did for purchases of adult videos. McKnight testified that his suppliers, including Mason, assured him that the K2 products he was selling were legal and that he conducted independent research and obtained lab reports to determine that the ingredients listed on the K2 packages were not controlled substances or controlled-substance analogues. McKnight generally

denied that he entered into an agreement with the other conspirators to possess or distribute controlled substances or controlled-substance analogues. After the close of all the evidence, the district court denied McKnight's renewed motion for judgment of acquittal, and the jury returned a guilty verdict.

McKnight appeals, arguing that because the evidence was insufficient to sustain his conviction, the district court erred in denying his motions for judgment of acquittal. We review *de novo* the denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the jury's verdict and reversing "only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Ramos, 814 F.3d 910, 915 (8th Cir.) (quoting United States v. Brooks, 715 F.3d 1069, 1081 (8th Cir. 2013)), cert. denied, Nos. 16-5089 & 16-5090, 2016 WL 3633118 & 2016 WL 3633122 (Oct. 3, 2016). We apply this exacting standard "even when the conviction rests entirely on circumstantial evidence." Id. (quoting United States v. Tillman, 765 F.3d 831, 833 (8th Cir. 2014)).

McKnight first argues that the evidence was insufficient to prove that he possessed the requisite knowledge to support his convictions for possessing with intent to distribute and for distributing a controlled substance or controlled-substance analogue. Although "[k]nowledge is one element of [a] drug-distribution charge[] under 18 U.S.C. § 841(a)," id., the government is "not required to prove that the defendant actually knew the exact nature of the substance with which he was dealing," id. (quoting United States v. Sheppard, 219 F.3d 766, 769 (8th Cir. 2000)). The government need show only "a general criminal intent, *i.e.*, awareness that the substance possessed was a controlled substance of some kind." Id.; see also United States v. Qattoum, 826 F.3d 1062 1065 (8th Cir. 2016). In cases involving a controlled-substance analogue, the government may establish the requisite knowledge either by showing that the defendant "knew [he] was dealing with some controlled substance, regardless of whether [he] knew the identity of the substance," or by showing that the defendant "knew the specific features of the substance that make it

a controlled substance analogue." Ramos, 814 F.3d at 916 (citing McFadden v. United States, 135 S. Ct. 2298, 2302, 2305 (2015)). The "specific features" that make a substance a controlled-substance analogue include a chemical structure that is "substantially similar" to that of a controlled substance listed in schedule I or II, or "a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than [that] of a controlled substance in schedule I or II . . . or [that] is represented or intended to have that effect." McFadden, 135 S. Ct. at 2302, 2305 (quoting 21 U.S.C. § 802(32)(A)). "A defendant who possesses a substance with knowledge of [these specific] features knows all of the facts that make his conduct illegal . . . ." Id. at 2305. Circumstantial evidence may be used to prove the requisite knowledge because a "factfinder can seldom know with certainty what someone actually knows." Ramos, 814 F.3d at 915 (quoting United States v. Noibi, 780 F.2d 1419, 1421 (8th Cir. 1986)). This circumstantial evidence "could include, for example, a defendant's concealment of his activities, evasive behavior with respect to law enforcement, knowledge that a particular substance produces a 'high' similar to that produced by controlled substances, and knowledge that a particular substance is subject to seizure at customs." McFadden, 135 S. Ct. at 2304 n.1.

We first conclude that the government offered sufficient evidence in the form of testimony by its expert witnesses to establish that AM-2201, XLR-11, and UR-144 were listed as either controlled substances or controlled-substance analogues for purposes of 21 U.S.C. § 841(a)(1) at the time K2 products containing these substances were sold from McKnight's store. We also conclude that the government offered sufficient circumstantial evidence to establish that McKnight was aware that the K2 products he was selling were in fact controlled substances or controlled-substance analogues—even if he did not know precisely which such substance he was selling. Under the standard set forth by the Supreme Court in McFadden, the government's proof was sufficient to show that McKnight knew the "specific features" that rendered the K2 products he was selling controlled substances or controlled-substance analogues. Mason, Burford, and Taylor testified to the "cloak-

and-dagger" methods McKnight imposed upon the sale of the K2 products, *i.e.*, storing K2 products in a locked toolbox or freezer in the back office, selling K2 products from under the counter without use of the cash register or the provision of a sales receipt, arranging for the K2 products to be delivered in USPS packages subject to search only by execution of a warrant, and packaging purchases in black DVD cases and instructing customers that those DVD cases would signal employees to conduct future sales. McKnight explained to Burford that the K2 products were "synthetic marijuana," which indicated his knowledge that the pharmacological effects of the K2 products were similar to those of marijuana, a controlled substance. The testimony of Mason, Burford, and Taylor also established that McKnight was aware that customers intended to use the K2 products to achieve those pharmacological effects, *i.e.*, McKnight was aware that customers bought the K2 products to smoke to get high, not to use as "incense," "potpourri," or "herbal Viagra."

McKnight points to his own testimony, which, he claims, explains the innocent motivation behind the covert nature of his sales and delivery methods and refutes the statements made by Mason, Burford, and Taylor regarding his knowledge of the products' pharmacological effects and his awareness of his customers' intended use of the K2 products. But the jury rejected McKnight's testimony in favor of the testimony offered by the government's witnesses. See United States v. Ways, 832 F.3d 887, 896 (8th Cir. 2016). We thus conclude that the evidence was sufficient to prove McKnight's knowledge under the standards set forth in McFadden.

The evidence was also sufficient to prove "beyond a reasonable doubt (1) that there was a conspiracy (an agreement to possess with intent to distribute the drugs); (2) that [McKnight] knew of the conspiracy; and (3) that [McKnight] intentionally joined the conspiracy." See United States v. Shaw, 751 F.3d 918, 920 (8th Cir. 2014). As recounted above, the evidence established that McKnight participated in a conspiracy with Mason, Burford, and Taylor to distribute controlled substances and

controlled-substance analogues from Starstruck Video. Mason, Burford, and Taylor each testified that all of the conspirators, including McKnight, knew that customers purchased the K2 products to smoke to get high, that they all engaged in cloak-and-dagger methods to keep their activities "under the radar," and that they were all aware that the K2 products were illegal to distribute. Thus, the district court did not err in denying McKnight's motion for judgment of acquittal.

The judgment is affirmed.

———————————————