# United States Court of Appeals

### For the Eighth Circuit

———————————————

No. 17-1411

———————————————

United States of America

*Plaintiff - Appellee*

v.

Muhammad Anwar

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Northern District of Iowa - Waterloo

——————————

Submitted: September 21, 2017
Filed: January 24, 2018

——————————

Before SMITH, Chief Judge, WOLLMAN and GRUENDER, Circuit Judges.

——————————

SMITH, Chief Judge.

A jury convicted Muhammad Anwar of : (1) conspiracy to distribute controlled substances and controlled substance analogues, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c), and 846, and (2) conspiracy to commit money laundering, in violation

of 18 U.S.C. § 1956(h). The district court[1] sentenced Anwar to 240 months' imprisonment on the first count and 60 months on the second count, to run consecutively, followed by three years of supervised release. Anwar appeals the jury verdict and his sentence. We affirm.

## I. *Background*

"We recite the facts in the light most favorable to the jury's verdict." *United States v. Payne–Owens*, 845 F.3d 868, 870 n.2 (8th Cir. 2017) (quoting *United States v. Stevens*, 439 F.3d 983, 986 (8th Cir. 2006)). Anwar agreed with Ahmad Saeed and another person in 2012 to distribute synthetic cannabinoid products. Anwar and Saeed knew these products, which contained both controlled substances and controlled substance analogues, would be sold for human consumption. Anwar also agreed to distribute synthetic cathinones ("bath salts"), which contained controlled substance analogues intended for human consumption. The agreement ended about March of 2014. Anwar and Saeed's main source for the controlled substances was Mohammed Saleem. Saeed began dealing with Saleem as early as 2009, when Saleem supplied Saeed with synthetic cannabinoid products. Saeed received and distributed thousands of bags of synthetic cannabinoid products per week. Anwar became Saeed's partner in May 2012, although Saeed remained the sole person to deal with Saleem at the beginning of the partnership. Anwar and Saeed also obtained synthetic cannabinoid products from Shakeel Khan.

Beginning in late 2013, Anwar dealt directly with the wholesalers. On at least five occasions, he purchased approximately $8,000 to $9,000 of synthetic cannabinoid products at a time, which he received via FedEx. Anwar supplied the synthetic drug products primarily to convenience stores in the Waterloo, Cedar Rapids, Cambridge, and Des Moines, Iowa areas. At its peak, Saleem estimated that the Anwar–Saeed

---

[1]The Honorable John A. Jarvey, Chief Judge, United States District Court for the Southern District of Iowa.

enterprise sold between $600,000 to $800,000 of products to consumers per month. Store owners paid Anwar and Saeed by cash, check, or money order. At Anwar and Saeed's request, persons paying via check or money order—up to $1,000 each—always left the "pay to" line blank, and they often denoted a "loan" in the "memo" line. The checks and money orders then could be used much in the same way as cash.

Anwar's activities coincided with a national rise in synthetic cannabinoid abuse. In response, the Drug Enforcement Administration (DEA) conducted frequent drug raids targeting both manufacturers and sellers. Not surprisingly, several store owners returned products to Anwar and Saeed. Anwar addressed at least one store owner's concern with assurances that the products were legal; he also gave the store owner a lab report purporting to prove that the products were legal.[2] However, Anwar advised another store owner to sell only to people he knew and to hide the products behind the counter from the general public.

In August 2012, the Central Iowa Drug Task Force (CIDTF) began a series of investigations into synthetic cannabinoid-containing products. CIDTF conducted controlled buys from a Cambridge convenience store. Laboratory analyses revealed the presence of XLR-11 and UR-144, both synthetic cannabinoids, in the incense packages. CIDTF then received and executed a search warrant, which led to the seizure of numerous packages of synthetic cannabinoid products from the store. Some of the packages contained labels that read "100% cannabinoid free/DEA compliant." The store manager identified Anwar as the supplier of the products. The manager also informed law enforcement officers that Anwar had also offered him a "bath salt" product called "Pump It." A confidential informant (CI) also purchased Pump It at a

---

[2]The laboratory reports were not comprehensive. The reports only identified substances that were not in the products tested and did not state what substances were actually found in the test product.

different convenience store in October 2012; this store also received the bath salt from Anwar or Saeed.

CIDTF conducted three controlled buys in June 2013 at a convenience store and an adjoining mobile wireless store in Waterloo that Anwar supplied. On two occasions, the CI purchased synthetic cannabinoid products at both stores, where the products were stored behind the counter and out of the public view. Laboratory analyses showed the presence of XLR-11. On the third occasion, the CI purchased bath salts packaged as "White Angel" and "Blue." Either Anwar or Saeed supplied these controlled substances to the stores. Between December 2012 and June 2013, they delivered synthetic cannabinoid products to the mobile wireless store three times, each time supplying at least 500 packages of the products.

Law enforcement then executed search warrants at the Waterloo mobile wireless store, convenience store, and two residences. The search led to seizures of nearly 2,000 grams of synthetic cannabinoid products and almost 30 grams of bath salts from the locations. Following the raid, the two store managers temporarily ceased drug operations but soon resumed sales. Anwar never terminated his drug wholesale enterprise. CIDTF again conducted control buys at the stores in December 2013 and February 2014. Officers executed a search warrant in March 2014, where they seized nearly 90 grams of bath salts. The prosecution of this drug operation resulted in convictions and prison sentences for Earl and Mary Ramos. *United States v. Ramos*, 814 F.3d 910 (8th Cir. 2016). The Ramoses purchased the synthetic drugs from Saeed and Anwar. Earl Ramos paid his suppliers with money orders, each up to $1,000. Ramos's internal records showed when and to whom the money orders were paid, but the money orders themselves never identified Anwar as the payee.

In addition to supplying to the convenience stores, Anwar also opened a liquor store in a Des Moines suburb. From there, he supplied synthetic cannabinoid products to liquor and convenience stores in the Des Moines area. Anwar hired Erika Romar

to work at the liquor store. He instructed Romar that each week the liquor store would receive two large FedEx boxes. He directed her to place the shipment in the back room, shut the door, and call him immediately. He later told Romar that the boxes contained synthetic cannabinoid products. Eventually, Anwar assigned Romar the task of dividing the products into smaller parcels for the customer stores. Anwar then delivered these parcels to his customers.

After Romar had worked for several months at the liquor store, Anwar transferred her to a Des Moines mobile wireless store, where she joined her then-boyfriend, Randy Tyrell.[3] Anwar then had the boxes of synthetic cannabinoids shipped to the wireless store instead of the liquor store, and Romar performed the same duty as she had previously—receiving the boxes and parsing out the products to amounts the customers specified. Some of the customers came to the store to pick up their synthetic cannabinoid orders and paid Romar. Anwar, accompanied by Tyrell, also delivered to nine or ten other businesses in the surrounding area. At one point, Anwar traveled to Pakistan; during his time out of the country, Romar called Anwar to get instructions regarding product deliveries. Anwar also arranged for several individuals—his wife, his daughters, Romar and Tyrell, and two others—to help repackage old products that were not selling well into new packages under brand names that sold well.

In March 2014, law enforcement officers executed a search warrant of the mobile wireless store. They seized packages that later tested positive for the synthetic cannabinoids XLR-11, UR-144, PB-22, and AB-FUBINACA. The day after the search, Anwar told one of his customers that he had 500 "pieces" with illegal chemicals taken from the wireless store.

---

[3]Erika Romar and Randy Tyrell married in 2014.

In September 2015, a grand jury returned a superseding indictment, charging Anwar and Saeed with conspiracy to distribute controlled substances and controlled substance analogues and conspiracy to launder money. Saeed pleaded guilty to both counts. Saeed denied ever selling bath salts. Anwar did not plead guilty, and his case proceeded to trial. Prior to the trial, Anwar gave a proffer interview with the government. He admitted to the interviewing Internal Revenue Service (IRS) agent[4] that he had always harbored suspicions about the legality of the products that he sold, in part, because these products cost much more than other similarly marketed incense products. Anwar also admitted that he knew that people purchased these products to smoke or to ingest. Further, he agreed with the IRS agent that he remained willfully blind to the nature of the substances that he sold. On the eve of Anwar's trial, Saeed's attorney contacted the government by e-mail, informing the prosecution that Saeed now admitted to selling bath salts, but he stopped selling the products in approximately March 2012. The government did not inform Anwar of Saeed's admission.

At trial, Anwar moved for a mistrial, alleging that a government witness made an improper comment. He also orally moved for a judgment of acquittal. The district court denied both motions. The jury found Anwar guilty on both conspiracy counts. Anwar moved for a new trial, which the district court denied. At sentencing, Anwar objected to the district court's calculation of his base offense level and to the court applying two sentencing enhancements. The court overruled Anwar's objections. Anwar's total offense level of 43 and criminal history category of II yielded a Guidelines recommendation of life imprisonment. However, because the statutory maximum for each of Anwar's convicted offenses was 20 years' imprisonment, *see* 21 U.S.C. § 841(b)(1)(C); 18 U.S.C. § 1956(h), his Guidelines range was 480 months'

---

[4]The IRS was involved in the criminal investigation because "in many narcotic investigations . . . those activities have a strong financial component to them." Trial Transcript, Vol. III, at 472, *United States v. Anwar*, No. 6:15-cr-02005-JAJ-1 (N.D. Iowa Oct. 28, 2015), ECF No. 128.

imprisonment, *see* U.S.S.G. § 5G1.2(b). The district court applied a downward variance to the Guidelines recommendation and sentenced Anwar to 300 months' imprisonment—240 months' imprisonment on the drug conspiracy conviction and 60 months on the conspiracy conviction, to run consecutively.

## II. *Discussion*

Anwar raises four issues on appeal. First, he argues that his conviction is not supported by sufficient evidence. Second, Anwar contends that the district court erred in denying his motion for a new trial based on an improper government witness statement. Third, he alleges that the district court procedurally erred in calculating his total offense level under the Sentencing Guidelines. Last, Anwar asserts that his sentence was substantively unreasonable.

## A. *Sufficiency of the Evidence*

We first address Anwar's argument that the government failed to prove both charges. "We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Guenther*, 470 F.3d 745, 747 (8th Cir. 2006) (quoting *United States v. Washington*, 318 F.3d 845, 852 (8th Cir. 2003)). "[I]t is axiomatic that [we do] not pass upon the credibility of witnesses or the weight to be given their testimony . . . ." *United States v. Spight*, 817 F.3d 1099, 1102 (8th Cir. 2016) (quoting *United States v. Goodale*, 738 F.3d 917, 923 (8th Cir. 2013)). Finally, "[t]he verdict will be upheld if there is any interpretation of the evidence that could lead a reasonable jury to convict." *United States v. Brandon*, 521 F.3d 1019, 1025 (8th Cir. 2008) (citation omitted).

### 1. *Conspiracy To Distribute a Controlled Substance or Controlled Substance Analogue*

To convict under 21 U.S.C. § 841(a), "the government had to prove beyond reasonable doubt (1) knowledge; (2) possession; and (3) intent to distribute the

-7-

controlled substance." *United States v. Noibi*, 780 F.2d 1419, 1421 (8th Cir. 1986) (citing 21 U.S.C. § 841(a)). Anwar disputes only the knowledge element of the crime. He claims that the government did not prove that he knowingly sold controlled substances of any kind. He argues that he could not have known the products were illegal because these chemicals were obscure and their illegality was uncertain throughout the time he sold them.

"[A] defendant does 'not need to know the exact nature of the substance in [his] possession, only that it was a controlled substance of some kind.'" *United States v. Morales*, 813 F.3d 1058, 1065 (8th Cir. 2016) (quoting *United States v. Martin*, 274 F.3d 1208, 1210 (8th Cir. 2001)). "[T]he knowledge element . . . can be proved by demonstrating either actual knowledge *or deliberate ignorance*." *United States v. Honea*, 660 F.3d 318, 328 (8th Cir. 2011) (alteration in original) (quoting *United States v. Hristov*, 466 F.3d 949, 952 (11th Cir. 2006)). "Deliberate ignorance is established if the defendant was 'presented with facts that put him on notice that criminal activity is probably afoot' but 'failed to investigate those facts, thereby deliberately declining to verify or discover the criminal activity.'" *United States v. Sdoulam*, 398 F.3d 981, 993 (8th Cir. 2005) (quoting *United States v. Hildebrand*, 152 F.3d 756, 764 (8th Cir. 1998), *abrogated on other grounds by Whitfield v. United States*, 543 U.S. 209 (2005)). "[A] defendant's concealment of his activities, evasive behavior with respect to law enforcement, knowledge that a particular substance produces a 'high' similar to that produced by controlled substances, and knowledge that a particular substance is subject to seizure" are all examples of circumstantial evidence for the knowledge element. *McFadden v. United States*, 135 S. Ct. 2298, 2304 n.1 (2015).

Here, the government showed that Anwar chose to remain deliberately indifferent to knowledge of the illegality of the products that he trafficked. He admitted knowing that people ingested or smoked the products despite their being marketed as an incense. He instructed store owners to conceal these products from the

general public and the police. Anwar knew that the items had been seized by law enforcement. He knew that the products were selling at prices as much as 10 to 20 times higher than traditional incense products. He also admitted to remaining ignorant of what was in the products because they were selling. Taken together, Anwar's admissions show that he was on notice that criminal activity was afoot, but he deliberately declined to verify or discover the criminal activity. *See Sdoulam*, 398 F.3d at 993. Because Anwar's deliberate ignorance satisfies the knowledge element of the crime, the government met its burden of proof with respect to knowledge.

### 2. *Conspiracy To Launder Money*

Anwar claims that the transactions he entered with Earl Ramos were recorded business transactions and not money laundering. He also questions Ramos's credibility, implying that Ramos testified on the government's behalf in exchange for a lesser prison sentence.

"[T]he three essential elements of conspiracy to launder money are: (1) an agreement . . . to launder money; (2) the defendant's voluntary joinder of the agreement; and (3) the defendant's knowing joinder of the agreement." *United States v. Jarrett*, 684 F.3d 800, 802 (8th Cir. 2012) (ellipsis in original) (quotations omitted). Money laundering consists of four elements:

> (1) defendant conducted, or attempted to conduct a financial transaction which in any way or degree affected interstate commerce or foreign commerce; (2) the financial transaction involved proceeds of illegal activity; (3) defendant knew the property represented proceeds of some form of unlawful activity; and (4) defendant conducted or attempted to conduct the financial transaction knowing the transaction was "designed in whole or in part [] to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity."

*United States v. Dvorak*, 617 F.3d 1017, 1021–22 (8th Cir. 2010) (alteration in original) (quoting *United States v. Phythian*, 529 F.3d 807, 813 (8th Cir. 2008)).

As an appellate court, we do not "judge credibility of witnesses." *United States v. Tillman*, 765 F.3d 831, 834 (8th Cir. 2014) (quoting *United States v. Conway*, 754 F.3d 580, 587 (8th Cir. 2014)); *see also United States v. Rodriguez–Mendez*, 336 F.3d 692, 694 (8th Cir. 2003) ("The jury was capable of evaluating the credibility of testimony given in light of the agreements each witness received from the government. The appellate court is not required to re-weigh the evidence or judge credibility of witnesses."). At trial, Earl Ramos testified for the government that he would pay Anwar for the synthetic cannabinoid-laced products with money orders, each up to $1,000. Anwar kept his name off the money orders themselves, but Ramos's internal records showed when and to whom the money orders were paid. The internal records consisted only of cryptic notations on stubs in a check ledger. None of Ramos's records explicitly identify Anwar or any corporation with which he was associated as being involved in the drug sale. Ramos's testimony, however, gave a reasonable jury the opportunity to understand the true nature of each transaction and the identities of the participants in that transaction.

The government showed that Anwar and Ramos agreed that Ramos would pay Anwar for the sale of the illegal synthetic cannabinoids through a mechanism where the money was not traceable back to Anwar. On this record, the government met its burden in proving Anwar's conspiracy to launder money.

B. *Motion for a New Trial*

Anwar argues that the district court erred in denying his motion for a new trial for two reasons: (1) the government violated *Brady*[5] by withholding a co-conspirator's confession, and (2) the court erred in permitting a government witness to give

---

[5]*Brady v. Maryland*, 373 U.S. 83 (1963).

prejudicial testimony. We review a district court's denial of a motion for a new trial for abuse of discretion. *United States v. Schropp*, 829 F.3d 998, 1005 (8th Cir. 2016). However, motions for a new trial "are disfavored and reviewed for a clear abuse of discretion, a rigorous standard." *United States v. Rubashkin*, 655 F.3d 849, 857 (8th Cir. 2011) (citation omitted).

## 1. Brady *Violation*

Anwar's *Brady* violation argument rests on Saeed's admission to the government, on the eve of Anwar's trial, that he sold bath salts. He argues that Saeed's admission was potentially exculpatory, but the government withheld the information. We disagree.

"The government must disclose evidence favorable to a defendant whether requested or not." *United States v. Jones*, 101 F.3d 1263, 1272 (8th Cir. 1996) (citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). "The rule of *Brady* is limited to the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Kime*, 99 F.3d 870, 882 (8th Cir. 1996) (citation omitted). A *Brady* violation has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

To prove a *Brady* violation, "the defendant must show that *the evidence was favorable and material* and that the government suppressed the evidence." *United States v. Ellefsen*, 655 F.3d 769, 778 (8th Cir. 2011) (emphasis added) (citation omitted). "[E]vidence is 'material' only if there is a 'reasonable probability' that, had it been disclosed, 'the result of the proceeding would have been different.'" *United States v. Robinson*, 809 F.3d 991, 996 (8th Cir. 2016) (quoting *Strickler*, 527 U.S. 263 at 280). Additionally, "[t]he government does not suppress evidence in violation of

*Brady* by failing to disclose evidence to which the defendant had access through other channels." *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001) (citation omitted). Likewise, "when the government does not disclose a potential source of evidence but the evidence available from that source is cumulative of evidence already available to the defendant, it has committed no *Brady* violation." *Id.* (citation omitted).

Here, the withheld information was neither favorable nor material to Anwar's case. Saeed's confession in no way exculpated Anwar because Saeed never claimed to be the sole person distributing bath salts. Indeed, the evidence could reasonably tend to inculpate Anwar, as it supports the existence of a conspiracy to distribute the controlled substance. Moreover, the evidence was cumulative; Anwar acknowledged in his opening brief that he already knew that Saeed was selling bath salts. Taken together, the government did not withhold evidence that was favorable and material to Anwar's case. The district court did not abuse its discretion in denying Anwar's *Brady* motion for a new trial.

## 2. *Prejudicial Witness Testimony*

Anwar contends that a government witness gave impermissible trial testimony that prejudiced his case; the witness stated that Anwar previously "had legal troubles and he was prosecuted federally." Trial Transcript, Vol. III, at 570.

Upon the defendant's motion, "the [district] court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). However, "Rule 33 motions are disfavored." *Rubashkin*, 655 F.3d at 857 (citation omitted). "Rule 33 is [an] unusual remedy that is reserved for 'exceptional cases in which the evidence preponderates heavily against the verdict.'" *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (quoting 3 Charles Alan Wright, Federal Practice and Procedure § 553, at 248 (2d ed. 1982)). The district court "must exercise the Rule 33 authority 'sparingly and with caution.'" *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). While "the district court is permitted

to 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict,'" the "court may grant a new trial . . . only if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred." *United States v. McClellon*, 578 F.3d 846, 857 (8th Cir. 2009) (quoting *United States v. Starr*, 533 F.3d 985, 999 (8th Cir. 2008)). However, "[a]dmission of a prejudicial statement is normally cured by striking the testimony and instructing the jury to disregard the remark." *United States v. Brandon*, 521 F.3d 1019, 1026 (8th Cir. 2008) (citation omitted).

Here, the district court held a Rule 33 hearing and found that the government had not acted in bad faith by eliciting improper testimony. The court further found that the "improper testimony was brief, and while it implied prior criminal charges, it did not imply a conviction." *United States v. Anwar*, No. 6:15-cr-02005-JAJ, slip op. at 5 (N.D. Iowa Feb. 3, 2016), ECF No. 125. Moreover, the district court at the close of the trial "reminded the jury to focus on the crimes Mr. Anwar was charged with, and not on peripheral issues." *Id.* Finally, the district court concluded that "there [was] 'strong evidence in the record to support each of [Mr. Anwar's] convictions.'" *Id.* (second alteration in original) (quoting *United States v. Maples*, 754 F.2d 299, 301 (8th Cir. 1985)). The court noted:

> The Government called witnesses from each step of Mr. Anwar's wholesale process: his suppliers, employees, and customers all testified that they saw him buying, selling, and delivering synthetic drugs. Law enforcement officers testified that they seized and lab-tested drugs from Mr. Anwar's store and Mr. Anwar's customers. The Government offered evidence that he knew the drugs were illegal, including pictures of their unusual labeling, evidence of their disproportionate prices, and testimony that Mr. Anwar was told about police raids on sellers. The jury also heard about Mr. Anwar's proffer agreement, and that Mr. Anwar admitted selling the drugs while willfully blind to their illegality. And the Government provided records and testimony showing that Mr. Anwar concealed the payments made to him.

*Id.* at 5–6. Thus, the court concluded that "[a]ny prejudice that resulted from [the] isolated testimony 'was harmless in the context of the whole trial.'" *Id.* at 6 (quoting *United States v. Reed*, 724 F.2d 677, 680 (8th Cir. 1984)).

In sum, the district court weighed the overwhelming evidence against Anwar against a single instance of admission of objectionable testimony. After veering into the weeds, the government's questioning immediately returned to an admissible line. The court found that no prejudice occurred during the brief detour. The court also reminded the jury to disregard peripheral issues and to focus on Anwar's charged crimes. Taken together, the district court did not clearly abuse its discretion in denying Anwar's motion for a new trial under Rule 33.

## C. *Calculation of Total Offense Level Under the Sentencing Guidelines*

Anwar asserts that the district court erred in: (1) calculating his base offense level; (2) adding two levels for maintaining the premises under U.S.S.G. § 2D1.1(b)(12); and (3) adding three levels for his role as a "supervisor" or "manager" under § 3B1.1(b). "We review the district court's application of the sentencing guidelines de novo and its factual findings for clear error." *United States v. Miller*, 511 F.3d 821, 823 (8th Cir. 2008) (citation omitted).

### 1. *Base Offense Level*

Anwar objects to the district court's use of the 1:167 ratio when calculating drug amounts to determine the base offense level under the Guidelines. "In cases involving controlled substances not specifically referenced in the guidelines," such as here, "the district court must use the marijuana-equivalency ratio for the most closely related controlled substance found in the drug-equivalency tables." *Ramos*, 814 F.3d at 918 (citing U.S.S.G § 2D1.1, cmt. 6).

In *Ramos*, we held that the 1:167 marijuana-equivalency ratio is the correct ratio to apply to the synthetic cannabinoids at issue in this case because these chemicals most closely resemble THC, which has a 1:167 marijuana-equivalency ratio. *Id.* at 919. Additionally, at Anwar's sentencing hearing, a DEA expert witness testified that the synthetic cannabinoid products at issue most closely resembled THC, rather than marijuana. Anwar's counsel also conceded that the 1:167 ratio is "standing law" in this circuit. On appeal, Anwar again acknowledges that the 1:167 ratio is the law, but he contends nevertheless that the ratio should be 1:1.

"Our long standing rule is that one panel may not overrule an earlier decision by another." *Jackson v. Ault*, 452 F.3d 734, 736 (8th Cir. 2006) (citation omitted). Only the en banc court "has [the] authority to overrule a prior panel opinion, whether in the same case or in a different case." *Cottier v. City of Martin*, 604 F.3d 553, 556 (8th Cir. 2010) (en banc). The district court therefore correctly calculated Anwar's base offense level using the 1:167 ratio.

### 2. *Maintaining the Premises*

Anwar next argues that the district court erred in applying a two-level enhancement for maintaining the premises. The district court must increase the offense by two levels "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). This enhancement "applies when a defendant uses the premises for the purpose of substantial drug-trafficking activities, even if the premises" also served other, legitimate, functions. *United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012). To determine whether a defendant maintained a premises, "the court should consider whether the defendant had a possessory interest in the premises and the extent to which the defendant controlled access to, or activities at, the premises." *United States v. Renteria–Saldana*, 755 F.3d 856, 859 (8th Cir. 2014) (citing U.S.S.G. § 2D1.1(b)(12), cmt. n.17). Holding title to the premises is not required for purposes of this section. *United States v. Garcia*, 774 F.3d 472, 475 (8th Cir. 2014) (per

-15-

curiam) (noting that the defendant maintained the premises "although the rent and utilities for the premises were in another individual's name, . . . this individual was rarely at the premises and [the defendant] had free access to the premises, mowed the lawn, and took out the garbage").

The premises at issue is the Des Moines mobile wireless store. Anwar does not own the building. However, the district court found that "there was no question from the evidence in this case that Defendant Anwar used [the mobile wireless shop] to store and distribute the controlled substances at issue." Sentencing Transcript at 132, *United States v. Anwar*, No. 6:15-cr-02005-JAJ-1 (N.D. Iowa Feb. 7, 2017), ECF No. 187. Anwar employed Romar and Tyrell to work at the store, and they testified that Anwar "ran that shop, used it to have . . . these synthetic products dropped off," and that the Tyrells "would then help [Anwar] deliver." *Id.* at 121. The district court concluded:

> There's no question from even the photographs of this case that the [mobile wireless] store, whatever legitimate reason or purpose it might have had or if it was just a front for the drug distribution, it doesn't matter, it doesn't matter that [another person] technically might have been the owner or manager of the store, there was no question from the evidence in this case that Defendant Anwar used it to store and distribute the controlled substances at issue in this case.

*Id.* at 132. Because the evidence showed that Anwar used the wireless store for the purpose of substantial drug-trafficking activities, the district court did not clearly err in finding that he maintained a drug premises. *See Miller*, 698 F.3d at 707.

### 3. *Aggravating Role in the Offense*

Anwar contends that the district court erred in finding that he qualified for an offense level increase due to an aggravating role in the offense. He further maintains that the court should have instead decreased his offense level for a mitigating role.

-16-

The Guidelines require a three-level increase "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants." U.S.S.G. § 3B1.1(b). "[W]e define . . . 'manager' and 'supervisor' quite liberally." *United States v. Irlmeier*, 750 F.3d 759, 764 (8th Cir. 2014) (citation omitted). The enhancement applies to defendants "even where they manage or supervise only one other participant in the conspiracy." *Id.* (citations omitted). Indeed, "the enhancement 'may apply even if the management activity was limited to a single transaction.'" *Id.* (quoting *United States v. Lopez*, 431 F.3d 313, 318 (8th Cir. 2005)). However, "[t]he 'defendant[] must direct or enlist the aid of others.'" *Id.* (quoting *Lopez*, 431 F.3d at 318).

Anwar argues that instead of the aggravating role enhancements, he should have received a decrease for mitigating roles—he was recruited by Saeed, who according to Anwar "called the shots throughout;" he was ignorant of the legality of the substances he peddled because he had no training in chemistry, and law enforcement did not tell him that the substances were illegal.

These arguments fail. The district court found that Saeed clearly recruited Anwar to the conspiracy, but the two "quickly became partners." Sentencing Transcript at 133. Anwar recruited multiple store owners to sell the synthetic drugs, and Anwar supervised the Tyrells extensively in the drug operation. The district court found that Anwar "clearly gets an aggravating role just as it relates to [his supervision of] Erika and Randy Tyrell alone." *Id.* at 132. Anwar's reliance on his ignorance of the illegality of the synthetic cannabinoids is also misplaced. As discussed above, Anwar had ample reasons to suspect that these products were illegal, but he chose to remain deliberately ignorant. *See supra* Part II.A.1.

The district court committed no clear error in finding Anwar had an aggravating role under the Guidelines.

D. *Substantive Reasonableness of the Sentence*

Despite the district court applying a downward variance, Anwar argues that his sentence nevertheless is substantively unreasonable. He contends that no prison sentence is necessary because of his medical needs, his education level, and his cooperation with the government. Further, Anwar argues that he is not likely to recidivate because he is subject to deportation. *See* 8 U.S.C. § 1227(a)(2)(B)(i).

"When we review the imposition of sentences, whether inside or outside the Guidelines range, we apply a deferential abuse-of-discretion standard." *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (quoting *United States v. Hayes*, 518 F.3d 989, 995 (8th Cir. 2008)). "[W]e are to 'take into account the totality of the circumstances . . . .'" *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). A sentence is presumptively reasonable when it falls within the advisory guidelines. *United States v. Sanchez–Garcia*, 642 F.3d 658, 663 (8th Cir. 2011) (citations omitted). "[W]here a district court has sentenced a defendant below the advisory guidelines range, it is nearly inconceivable that the court abused its discretion in not varying downward still further." *United States v. Worthey*, 716 F.3d 1107, 1116 (8th Cir. 2013) (alteration in original) (quoting *United States v. Spencer*, 700 F.3d 317, 322 (8th Cir. 2012)).

Here, the district court found that Anwar's conspiracy "was massive, one of the largest" that the court had seen. Sentencing Transcript at 151. "In fashioning an appropriate sentence," *id.*, the district court considered the § 3553(a) factors, specifically citing consideration of the seriousness of the offense, the question of just punishment, the need for adequate deterrence to criminal conduct, the available sentencing options under the Sentencing Guidelines, the need to avoid unwarranted sentencing disparity among defendants with similar records, and the defendant's lack of remorse. The court found that the conspiracy "was wildly lucrative, totally greed driven," *id.*, and that "[i]t was dressed up as something that was legal" so that small town law enforcement would not "catch it," *id.* at 152. Further, while other defendants came through the court, which "serve[d] as such a wonderful wake-up call and they . . . never . . . come back again," Anwar "came back in with a rampage." *Id.* at

152–53. The court also "weighed heavily the need to avoid unwarranted sentencing disparity among defendants with similar records or lack thereof who have been found guilty of similar conduct." *Id.* at 153. Finally, the court found "Anwar show[ed] little remorse." *Id.*

In rendering its judgment, the court spent substantial time considering and discussing the § 3553(a) factors. We find no abuse of discretion. Anwar's sentence is not substantively unreasonable.

### III. *Conclusion*

For the reasons articulated above, we affirm the district court.

_____