# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2270

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Jason Elliott Clark, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  November 18, 2011
Filed: February 10, 2012

_____

Before WOLLMAN, MURPHY, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Jason Clark appeals his conviction for aggravated identity theft based on the sufficiency of the evidence to support conviction for that offense and the district court's admission of certain prior acts evidence. Because the district court[1] did not err by denying Clark's motion for judgment of acquittal or abuse its discretion by admitting the prior acts evidence, we affirm the conviction.

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

I.

Clark was charged with the following offenses: bank fraud conspiracy under 18 U.S.C. § 1349, two counts of bank fraud under 18 U.S.C. § 1344, identity theft under 18 U.S.C. § 1028, and aggravated identity theft under 18 U.S.C. § 1028A. At trial, the government presented evidence of a hub-and-spoke conspiracy with Marcus Benson as the hub and Jason Hansen, Nou Thao, and Clark as the spokes. In 2008, agents from the Minnesota Bureau of Criminal Apprehension, Bureau of Immigration and Customs Enforcement, Minnesota State Patrol, and the United States Postal Inspection Service conducted a criminal investigation of Benson. Officers began investigating Benson after receiving information that Benson was committing identity theft and bank fraud. Officers ultimately arrested Benson and executed a consent search of his home. During the search, officers located fraudulent identification documents, credit cards that did not belong to Benson, software and equipment used to produce fraudulent checks, a device known as a "skimmer" that is used to remove data from credit or identification cards and place the data onto other credit or identification cards, and wallet-size photographs. Officers later determined that the photographs were of Clark and co-defendants Hansen and Thao.

As the leader of this conspiracy, Benson provided his co-conspirators with fraudulent checks, which they deposited into their personal bank accounts. After depositing the checks, Hansen, Thao, and Clark promptly withdrew some of the money and later returned to withdraw a larger portion of the money. They would then give most of the funds to Benson while retaining a small portion. Although Hansen and Thao communicated with each other and with Benson, the evidence at trial demonstrated that they did not communicate with Clark during the conspiracy. Their actions, however, all followed the same pattern and involved one of the same victims, D.R.O.

Benson, Hansen, and Clark initially became friends while working together at an electronics store. After leaving the electronics store, Hansen became employed as a system analyst by a mortgage brokerage, where he had access to confidential customer information—including Social Security numbers, dates of birth, addresses, and bank account numbers—of individuals in the process of applying for mortgage loans. During this same period, Benson operated his own mortgage brokerage. In March of 2007, Hansen decided to disclose his employer's confidential customer information to Benson so that Benson could contact the individuals for his personal business. Hansen expected kickbacks from deals closed by Benson arising from the confidential information. Because Hansen did not have Benson's telephone number, he contacted their mutual friend, Clark. Hansen told Clark that he had access to "mortgage leads," was aware of Benson's mortgage business, and thought that he might be able to assist Benson. Tr. at 179-80.

According to Hansen's testimony, Benson ultimately used the confidential customer information to obtain the fraudulent checks that formed the basis of the check-cashing scheme. At some point, Benson approached Hansen and asked for help cashing checks, saying that he needed help cashing checks from his customers because of problems with his checking accounts. Benson also claimed that the purpose of the scheme somehow was to improve his customers' credit scores. Because Hansen did not have a bank account, however, he offered to assist Benson by approaching Thao and asking her to assist Hansen and Benson with the check-cashing scheme in the summer of 2007.

On August 16, 2007, Thao cashed the first check that she received from Hansen and Benson. The check bore the name and account number of D.R.O., the address 940 Barclay Street, St. Paul, Minnesota, and the date August 14, 2007. The check was made payable to Thao for $8,975.74. Thao deposited the check into her account, withdrew several hundred dollars initially, provided the money to Hansen, and then later withdrew more than $7,000. Thao conveyed the money to Hansen, who gave

Thao one-hundred dollars and Benson the rest of the money. Thao structured the withdrawals in this manner based on instructions received from Hansen and Benson.

On September 19, 2007, Clark deposited into his Wells Fargo account a check that he received from Benson. The check bore the name and account number of D.R.O., the address 940 Barclay Street, St. Paul, Minnesota, and the date September 18, 2007. The check was made payable to Clark for $10,250. On September 20, 2007, Clark withdrew $3,600 from his account. The next day, Clark withdrew $4,500 from his account and deposited a $145,000 cashier's check into his account.

Both checks written from D.R.O.'s account were fraudulent. D.R.O. testified that he never knew Clark, Benson, Hansen, or Thao. He also never lived at the Barclay Street address, which turned out to be Benson's former home address.

Wells Fargo consultant Barbara Pacenka initiated an investigation into Clark's account after both the $10,250 check and the $145,000 cashier's check were returned as being fraudulent. Pacenka initially believed that Clark may have been a fraud victim and called him to inquire into the nature of the two fraudulent checks. Clark told Pacenka that he was selling his cabin to a man in Cameroon and had received the checks from someone named Paul Benson. Clark explained that the $10,250 check constituted the down payment for the cabin and that the $145,000 cashier's check was for the purchase. Clark stated that he had sent the withdrawn funds to a broker via Western Union. Clark also agreed to repay the funds by November 4, 2007, but he did not honor this agreement. He also agreed to provide Pacenka with documentation concerning the property and Western Union transactions, but he never provided such documentation. Pacenka made subsequent attempts to follow up regarding the requested documentation and need for repayment, but Clark never answered Pacenka's calls or responded to her messages.

Pacenka also testified regarding Clark's Wells Fargo account and the type of information that Clark was required to provide to open the account. She explained that Clark completed an application disclosing his name, address, length of residency at that address, Social Security number, telephone number, and employment information. Clark also had to present photographic identification to open the account.

The evidence demonstrated that Clark's story to Pacenka concerning the checks was untrue. D.R.O. testified that he had never attempted to purchase a cabin and had never lived in, traveled to, or represented himself to be from Cameroon. In addition, Clark ultimately admitted to Postal Inspector Sabby that he actually received the checks from Marcus Benson rather than Paul Benson, deposited the checks into his account, later withdrew the funds, and gave all but $300 to Marcus Benson.

During trial, the government also presented evidence of Clark's prior conviction for identity theft. The government introduced into evidence the transcript of Clark's October 17, 2001, guilty plea and sentencing hearing for an identity theft committed on May 13, 2000, in Hennepin County, Minnesota. According to the transcript, Clark used the Social Security number of another actual person in a fraudulent attempt to obtain credit. Clark admitted during the hearing that he knew that such conduct was wrong and that the victim had lost more than $2,500 as a result. Immediately prior to the government's introduction of this evidence, the district court read a limiting instruction to the jury:

> This exhibit is being introduced for one particular purpose, and that is to show the possibility – to show evidence of the intent of Mr. Clark or the fact that he didn't make a mistake or knew what he was doing when he did this. This is evidence of another bad act, as we call them, and it's not evidence of his character to show that he would do these kinds of acts, but it is evidence of the fact that he may have had the intent to do the act

charged and did it because of lack of mistake and so forth, so use this evidence for that one particular purpose.

Tr. at 313.

At the conclusion of the government's evidence, and again at the close of evidence in the case, Clark moved for judgment of acquittal on the identity theft and aggravated identity theft counts. The district court denied the motion, and the jury returned verdicts of guilty against Clark on all counts.

Following the verdict, Clark renewed his motion for judgment of acquittal on the aggravated identity theft count, requesting the district court to set aside the conviction based on the sufficiency of the evidence. Clark also moved for the district court to vacate the conviction for identity theft because the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution prohibited a sentence for both identity theft and aggravated identity theft under the circumstances. The district court denied Clark's renewed motion for judgment of acquittal on the aggravated identity theft count and granted the motion to vacate the conviction for identity theft. Clark received a total sentence of 48 months' imprisonment – 24 months each for the bank fraud conspiracy (Count 1) and bank fraud (Counts 4 and 5) counts, to be served concurrently, and 24 months for aggravated identity theft (Count 15), to be served consecutively to the terms imposed for Counts 1, 4, and 5.

Clark appeals. He challenges the sufficiency of evidence to support the conviction for aggravated identity theft, and he challenges the district court's denial of his motion for judgment of acquittal on the offense of aggravated identity theft. Clark also appeals the district court's decision to admit prior acts evidence under Rule 404(b) of the Federal Rules of Evidence.

"We review *de novo* the denial of a motion for judgment of acquittal." United States v. Cook, 603 F.3d 434, 437 (8th Cir. 2010) (citing United States v. Chase, 451 F.3d 474, 479 (8th Cir. 2006)). "We apply the same standard of review to the district court's ruling on a motion for judgment of acquittal as we do to a sufficiency of the evidence challenge." Id. (citing United States v. Garcia, 562 F.3d 947, 958 (8th Cir. 2009)). "[W]e view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." United States v. Milk, 447 F.3d 593, 598 (8th Cir. 2006) (citing United States v. Cline, 570 F.2d 731, 733 (8th Cir. 1978)). "We must affirm a jury verdict if, taking all facts in the light most favorable to the verdict, a reasonable juror could have found the defendant guilty of the charged conduct beyond a reasonable doubt." United States v. Balanga, 109 F.3d 1299, 1301 (8th Cir. 1997) (citing United States v. Matra, 841 F.2d 837, 840 (8th Cir. 1988)). "A conviction may be based on circumstantial as well as direct evidence." United States v. Erdman, 953 F.2d 387, 389 (8th Cir. 1992) (citing United States v. Mallen, 843 F.2d 1096, 1099 (8th Cir. 1988)).

We review a district court's decision to admit evidence under Rule 404(b) for abuse of discretion. United States v. Foster, 344 F.3d 799, 801 (8th Cir. 2003). We "will reverse only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." Id. (quoting United States v. Ruiz-Estrada, 312 F.3d 398, 403 (8th Cir. 2002)).

III.

The aggravated identity theft statute provides:

Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful

authority, a means of identification *of another person* shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1) (emphasis added). To prove the offense of aggravated identity theft, the government must prove that "the defendant knew the means of identification was associated with an actual person rather than being purely fabricated." United States v. Retana, 641 F.3d 272, 275 (8th Cir. 2011) (citing Flores-Figueroa v. United States, 556 U.S. 646 (2009)). Clark agues that, when viewing the evidence in the light most favorable to the verdict, the evidence was insufficient for a reasonable juror to find beyond a reasonable doubt that Clark knew the means of identification on the $10,250 check belonged to an actual person.

Viewing the evidence in the light most favorable to the jury's verdict, a reasonable juror could have found beyond a reasonable doubt that Clark was guilty of identity theft. Ample evidence in the record supports the jury's finding that Clark knew that D.R.O. was a real person. The evidence showed that Clark had a friendship and long-standing association with Benson and Hansen. When Hansen needed Benson's telephone number to disclose confidential customer information to Benson, he contacted Clark to obtain Benson's contact information and told Clark that he had access to mortgage leads. Clark's activities followed the same pattern as the activities of Thao and Hansen, who regularly communicated with Benson. A reasonable juror could infer from this evidence that Clark had knowledge of the improper use of personal information of real people, including D.R.O., during the conspiracy.

The evidence of Clark's actions when confronted by Pacenka concerning the fraudulent checks further supports a finding that Clark knew that the name and bank account number on the $10,250 check belonged to a real person. When Pacenka asked Clark about the $10,250 check, Clark's response had nothing to do with D.R.O., but rather involved a story about selling a cabin to a Cameroonian and receiving checks from Paul Benson. Had Clark believed that D.R.O. was a fictitious person, he

could have devised a story involving D.R.O., including therein whatever facts that would best support Clark's ability to retain the funds that he stole. A reasonable juror could have concluded that Clark did not do this because he knew that D.R.O. was a real person who, if asked, would reveal that he did not know Clark, had not written a check to Clark, and had been the victim of identity theft and fraud by Clark.

Clark's ability to deposit the D.R.O. check and later withdraw some of the deposited money also evidences knowledge that he was using the means of identification of a real person. A reasonable juror could infer that Clark, being a bank account holder and prior perpetrator of identity theft, knew that banks open accounts for, and give credit to only real people. Thus, Clark knew that the scheme could result in successful deposits and withdrawals only if D.R.O. was a real person with a real bank account. In light of these circumstances, the district court properly denied Clark's motion for judgment of acquittal.

## IV.

The district court did not abuse its discretion by admitting evidence of Clark's prior identity theft conviction. Evidence of prior bad acts is admissible under Rule 404(b) for limited purposes such as intent, knowledge, or absence of mistake if:

> (1) it is relevant to a material issue; (2) it is similar in kind and not overly remote in time to the crime charged; (3) it is supported by sufficient evidence; and (4) its potential prejudice does not substantially outweigh its probative value.

United States v. Green, 151 F.3d 1111, 1113 (8th Cir. 1998) (citing United States v. Anderson, 879 F.2d 369, 378 (8th Cir. 1989)).

The Rule 404(b) evidence in this case was relevant to Clark's knowledge and intent that he was using the means of identification of another person, which was a

material issue. In addition, Clark presented a trial defense that he acted in good faith when depositing the checks. This defense placed Clark's knowledge and intent at issue. See United States. v. Sparkman, 500 F.3d 678, 683-84 (8th Cir. 2007) ("When a defendant is charged with insurance fraud, prior instances of insurance fraud may be admitted under Rule 404(b) to show the defendant's intent to commit the charged fraud if the prior fraud is similar to and not too remote in time from the charged fraud.") (citing United States v. Fitterer, 710 F.2d 1328, 1332 (8th Cir. 1983); United States v. Calvert, 523 F.2d 895, 908 (8th Cir. 1975)); United States v. Dugan, 150 F.3d 865, 867 (8th Cir. 1998) (holding that prior acts evidence was admissible to establish fraudulent intent when evidence of prior fraud scheme was "similar in pattern to the one in which [the defendants] embarked").

The prior acts evidence was similar in kind and not overly remote in time to the aggravated identity theft charged in this case. Similar to the situation in this case, the prior act involved Clark using the means of identification of another actual person for attempted financial gain. We apply "a standard of reasonableness, as opposed to a standard comprising an absolute number of years, in determining whether a prior offense occurred within a relevant time frame for purposes of Rule 404(b)." Green, 151 F.3d at 1113 (citing United States v. Burk, 912 F.2d 225, 228 (8th Cir. 1990)). Given the strong similarities in kind between the two acts, the approximately seven-year period between the prior act and the conduct alleged in this case did not render the identity theft conviction too remote for proper consideration. See United States v. Koski, 424 F.3d 812, 818 (8th Cir. 2005); see also United States v. Aldridge, 664 F.3d 705, 713-14 (8th Cir. 2011) (holding that district court did not err in admitting evidence of twelve-year-old conviction that demonstrated knowledge and intent).

The sufficiency of the evidence of the prior act is not subject to reasonable dispute in this case. The government introduced a transcript of Clark's change of plea hearing, during which Clark admitted his culpability for identity theft.

The district court acted within its broad discretion in concluding that the potential for unfair prejudice did not substantially outweigh the probative value of the prior acts evidence. The Rule 404(b) evidence was probative of Clark's intent, knowledge, and absence of mistake concerning his knowledge that he was using the means of identification of an actual person. Under the circumstances, any prejudice arising from such evidence would not have been unfair prejudice. See United States v. Yellow, 18 F.3d 1438, 1442 (8th Cir. 1994) (noting that Rule 403 is "concerned only with unfair prejudice, that is, an undue tendency to suggest decision on an improper basis.") (internal quotations omitted). Here, the district court further reduced any potential for unfair prejudice by giving an appropriate limiting instruction. See United States v. Oaks, 606 F.3d 530, 539 n.2 (8th Cir. 2010) (noting that "this Court has been reluctant to find that the evidence was unfairly prejudicial when the district court gave an appropriate limiting instruction, instructing the jury not to use the evidence as proof of the acts charged in the indictment") (citation omitted).

V.

The judgment is affirmed.

_____