# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-3170

_____

United States of America

*Plaintiff - Appellee*

v.

Jorge Alberto Sainz Navarrete, also known as Horacio Sainz Navarrete

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 15, 2019
Filed: April 8, 2020

_____

Before GRUENDER, KELLY, and ERICKSON, Circuit Judges.

_____

KELLY, Circuit Judge.

A jury found Jorge Sainz Navarrete guilty of conspiring to distribute methamphetamine in violation of 21 U.S.C. §§ 841 and 846, money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and two counts of conspiring to launder

money in violation of 18 U.S.C. § 1956(h). The district court[1] imposed a sentence of life imprisonment for the methamphetamine conspiracy and concurrent sentences of 240 months of imprisonment for the money-laundering offenses. Navarrete appeals.

## I. Background

During a seven-day jury trial, several witnesses testified that Navarrete directed them to transport methamphetamine from Arizona to Nebraska, distribute it in the Omaha area, and remit the proceeds to him. Maria Diaz testified that she was "the one taking charge of everything" for Navarrete. She recruited drivers to transport vehicles from Arizona to Omaha that contained methamphetamine in hidden compartments, including in a cavity behind the wheel of a PT Cruiser. She stated that the drivers went on at least six trips and that, on each trip, at least eight to 12 pounds of methamphetamine were concealed within their vehicles. Maria Diaz then arranged to have the methamphetamine removed from the vehicles and distributed in the Omaha area. She testified that her friend Alvaro Dominguez and her cousin Adrian Vega assisted with retrieving and distributing the methamphetamine.

Three of the drivers that Maria Diaz recruited—Deyanira Castaneda, Francisco Cano-Salgado, and Nathalie Martinez—testified at trial. They each stated that they drove or towed vehicles from Phoenix to Omaha at Navarrete's request. Castaneda said that she was told they were transporting "hielo," which she understood to mean methamphetamine, and that she observed round, burrito-sized packages being removed from behind the front wheel of a PT Cruiser after she helped transport it to Omaha. Cano-Salgado testified that he similarly observed "wrapped foot-long sized things" being removed from the PT Cruiser. Martinez testified that, after she helped transport the PT Cruiser from Phoenix to Omaha, she saw Dominguez, Castaneda,

[1]The Honorable Laurie Smith Camp, then Chief Judge, United States District Court for the District of Nebraska.

and another person enter a garage with tools and jack up the PT Cruiser. She saw debris on the floor and believed that they removed something from the car. On another occasion, Martinez observed Dominguez and others sawing into a white car and removing items wrapped in plastic bags.

Martinez testified that she later began selling methamphetamine for Navarrete. She got the methamphetamine from Dominguez, but Navarrete set the price. Vega also testified that he sold methamphetamine for Navarrete. He obtained it either from Maria Diaz or by removing it himself from cavities in cars. Vega initially reported to Maria Diaz or Dominguez, but he later reported directly to Navarrete.

Adam Trevino testified that he purchased approximately 100 pounds of methamphetamine from Navarrete and that Maria Diaz and Vega delivered it to him. Trevino later began cooperating with the government and, in June and July 2016, he made controlled purchases of methamphetamine from Vega. During one of these transactions, Vega called Navarrete because Navarrete wanted to talk to Trevino. The government also made controlled purchases of methamphetamine from Oscar Mayorga, who stated that Navarrete was his supplier.

Maria Diaz and Vega both testified that Navarrete directed them to deposit the proceeds from their methamphetamine sales into specific bank accounts. Maria Diaz stated that she recruited others to make the deposits for her, including Castaneda, Cano-Salgado, and Sindy Renteria. Castaneda and Cano-Salgado confirmed that they deposited cash into Wells Fargo bank accounts at Maria Diaz's request.

Maria Diaz and Vega documented these transactions by taking photos of the receipts and by recording in notebooks the amounts that they received from their sales and the amounts that were wired or deposited at Navarrete's request. The government later seized these notebooks and introduced them at trial. The government also found Maria Diaz and Dominguez in possession of methamphetamine, cash, money-transfer

receipts, and a phone containing contact information for Navarrete and other associates. The government found a PT Cruiser with a hidden cavity behind the front wheel in the garage of a house where Maria Diaz and Dominguez used to live.

One of the Wells Fargo bank accounts that received methamphetamine proceeds was an account that Navarrete had asked his girlfriend, Karla Diaz, to open in her name. Karla Diaz testified that Navarrete asked her to open the account based on the representation, later shown to be false, that he did not have identification. Karla Diaz stated that she considered the money in the account to be Navarrete's and that she would not withdraw money from it without Navarrete's permission.

The government introduced bank records and photographs showing that Vega, Cano-Salgado, and Renteria made cash deposits into Karla Diaz's Wells Fargo account. Text messages showed that Navarrete also told Trevino to make deposits into that account. Shortly after these deposits were made in the Omaha area, Karla Diaz withdrew roughly corresponding amounts from the account in Arizona. Karla Diaz testified that Navarrete directed her to make these withdrawals and that she gave him the money after she withdrew it. On June 2, 2016, Navarrete accompanied Karla Diaz to withdraw $2,000 cash from the account in Arizona. Vega had deposited $2,000 cash into the account in Omaha earlier that day.

In March 2016, Navarrete purchased a Corvette from Juan Carlos Ruiz at a used-car business in Omaha. Ruiz testified that he sold the car for a series of cash payments totaling $8,000. The purchase agreement listed Karla Diaz as the buyer and purported to contain her signature. However, Karla Diaz testified that she did not buy the Corvette and that the signature was not hers. She said that Navarrete had told her that he purchased the Corvette. Maria Diaz testified that, shortly after she first saw the Corvette, Navarrete asked her to go to the used-car business to make the final $4,000 payment and to pick up the car title. Maria Diaz used methamphetamine proceeds to complete the transaction and later gave the title to Navarrete.

-4-

Navarrete was arrested in November 2016. Officers seized a phone from him that contained photographs of bank-deposit receipts, the number for Karla Diaz's Wells Fargo account, wire-transfer communications, and the notebooks Maria Diaz and Vega had used to record their transactions. Navarrete's wallet also contained a business card with Karla Diaz's Wells Fargo account number on it and a business card for Ruiz's used-car business.

Navarrete was charged with conspiring to distribute methamphetamine, conspiring to launder money via Karla Diaz's Wells Fargo account, conspiring to launder money via the Corvette purchase, and money laundering via the June 2, 2016 bank transactions. The jury returned a verdict of guilty on all counts. Based in part on a drug quantity equivalent to 101,221.76 kilograms of marijuana, a role enhancement, and a criminal-livelihood enhancement, the district court imposed a within-Guidelines sentence of life imprisonment for the methamphetamine conspiracy and 240 months of imprisonment for the money-laundering offenses, with the sentences to run concurrently. On appeal, Navarrete challenges the sufficiency of the evidence for each of his convictions, the district court's drug-quantity finding, and the district court's application of the role and criminal-livelihood enhancements.

## II. Sufficiency of the Evidence

Navarrete argues that, because the evidence was insufficient, the district court erred by denying his motions for acquittal and for a new trial. We review the denial of a motion for judgment of acquittal de novo. United States v. Clark, 668 F.3d 568, 573 (8th Cir. 2012). "We must affirm a jury verdict if, taking all facts in the light most favorable to the verdict, a reasonable juror could have found the defendant guilty of the charged conduct beyond a reasonable doubt." Id. (citation omitted). We review the denial of a motion for a new trial for an abuse of discretion. United States v. Anwar, 880 F.3d 958, 969 (8th Cir. 2018). The district court "may grant a

new trial only if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred." Id. at 970 (cleaned up).

To establish that a defendant conspired to distribute drugs in violation of 21 U.S.C. §§ 841 and 846, "the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." United States v. Conway, 754 F.3d 580, 587 (8th Cir. 2014) (citation omitted). To establish that a defendant laundered money by concealment in violation of 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that:

> (1) [the] defendant conducted, or attempted to conduct a financial transaction which in any way or degree affected interstate commerce or foreign commerce; (2) the financial transaction involved proceeds of illegal activity; (3) [the] defendant knew the property represented proceeds of some form of unlawful activity; and (4) [the] defendant conducted or attempted to conduct the financial transaction knowing the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity.

United States v. Slagg, 651 F.3d 832, 844 (8th Cir. 2011) (cleaned up). To prove that a defendant conspired to launder money in violation of 18 U.S.C. § 1956(h), the government must prove that "the defendant agreed with another person to violate the substantive provisions of the money-laundering statute." Id. (cleaned up).

There was sufficient evidence for a reasonable juror to conclude that each element of these offenses was satisfied. Several witnesses testified that they were part of a conspiracy to distribute methamphetamine, that Navarrete supplied the methamphetamine, and that he profited from their sales. Their testimony was consistent with one another's and corroborated by physical evidence. This provided sufficient evidence for a reasonable juror to conclude, beyond a reasonable doubt, that

Navarrete conspired to distribute methamphetamine. See Conway, 754 F.3d at 587–88 ("[E]vidence at trial that consists primarily of testimony from other members of the conspiracy may suffice to establish defendant's guilt. . . . [E]vidence is sufficient to show a conspiracy where drugs are purchased for resale.").

There was also sufficient evidence for a reasonable juror to conclude, beyond a reasonable doubt, that Navarrete conspired to and did use Karla Diaz's Wells Fargo account to launder money by concealment. Karla Diaz testified that Navarrete told her to open the account in her name under false pretenses. Witness testimony, photographs, and documentary evidence showed that several people deposited methamphetamine proceeds into the account in Omaha at Navarrete's direction and that corresponding withdrawals were made from the account in Arizona. Karla Diaz testified that she made these withdrawals at Navarrete's request, and photographs showed that Navarrete was present for at least one of the transactions. This evidence was sufficient to support Navarrete's convictions for conspiring to launder and laundering money via the Wells Fargo account. See United States v. Bowman, 235 F.3d 1113, 11116 (8th Cir. 2000) (The "pattern and timing" of transactions can support an inference of money laundering by concealment); United States v. Shoff, 151 F.3d 889, 892 (8th Cir. 1998) ("[A] common type of money laundering is the transfer of unlawful proceeds into an account in another person's name.").

A reasonable juror could have likewise concluded, beyond a reasonable doubt, that Navarrete conspired to launder money via the Corvette transaction. There was evidence that Navarrete had the car titled in Karla Diaz's name without her knowledge, that he paid for the car in a series of cash transactions, and that he directed Maria Diaz to complete the sale with $4,000 in methamphetamine proceeds. Under these circumstances, we cannot agree with Navarrete that "there was nothing in the record to demonstrate that the Corvette transaction was anything other than a car purchase." See United States v. Pizano, 421 F.3d 707, 725–26 (8th Cir. 2005) (discussing when a juror may infer that co-conspirators shared a "tacit understanding"

to conceal the nature, location, source, ownership, or control of unlawful proceeds); Shoff, 151 F.3d at 892 ("Still another common type of money laundering is . . . the use of [unlawful] proceeds to buy assets in another person's name.").

### III. Drug Quantity

Next, Navarrete challenges the district court's drug-quantity finding. "The government bears the burden of proving drug quantity by a preponderance of the evidence." United States v. Plancarte-Vazquez, 450 F.3d 848, 852 (8th Cir. 2006) (citation omitted). When calculating drug quantity, "the sentencing court may consider all transactions known or reasonably foreseeable to the defendant that were made in furtherance of the conspiracy." Id. We review for clear error and reverse only when "the entire record definitely and firmly illustrates that the lower court made a mistake." United States v. Marshall, 411 F.3d 891, 894 (8th Cir. 2005).

The Probation Office prepared a Presentence Investigation Report (PSR), which found that an amount of 48 pounds of methamphetamine mixture was reasonably foreseeable to Navarrete. The PSR based this finding on Maria Diaz's testimony that, on at least six occasions, Navarrete had arranged for the transportation of at least eight to 12 pounds of methamphetamine. The PSR also noted that officers had recovered 4,047.62 grams of methamphetamine mixture during their investigation, and that purity tests had revealed that this mixture contained 3,288.57 grams of actual methamphetamine. In accordance with the United States Sentencing Guidelines, which "provide a means for combining differing controlled substances to obtain a single offense level," USSG § 2D1.1, cmt. (n.8(B)) (2016),[2] the PSR converted these quantities of actual methamphetamine and methamphetamine mixture to their marijuana equivalents. To avoid double counting, the PSR then subtracted the amount of actual methamphetamine that had been recovered during the

---

[2]The 2016 Guidelines Manual applies to Navarrete's convictions.

investigation from the amount of methamphetamine mixture that Maria Diaz had testified Navarrete arranged to transport. This resulted in a combined total of 101,221.76 kilograms of marijuana equivalent. The district court adopted the PSR's drug-quantity calculation over Navarrete's objection.

Navarrete contends that it was clearly erroneous to find any drug quantity beyond the amount of methamphetamine that was recovered and tested for purity because the additional amount was "based on the mere assumption or guess of cooperating defendants." However, it is "well-established that the testimony of co-conspirators may be sufficiently reliable evidence upon which the court may base its drug quantity calculation for sentencing purposes." Plancarte-Vazquez, 450 F.3d at 852. And here, the district court's estimate was well within the range supported by the evidence. Maria Diaz's testimony suggested that Navarrete may have transported more than 72 pounds of methamphetamine to Nebraska, and Trevino testified the he had obtained at least 100 pounds of methamphetamine from Navarrete. On this record, we are not definitely and firmly convinced that the district court's drug-quantity finding was mistaken. See Marshall, 411 F.3d at 894.

## IV. Sentencing Enhancements

Finally, Navarrete challenges the district court's application of role and criminal-livelihood enhancements to his base offense level. "We review a district court's factual findings regarding whether a leadership enhancement is warranted for clear error and its legal conclusions de novo." United States v. Musa, 830 F.3d 786, 788 (8th Cir. 2016). The government bears the burden to prove a leadership enhancement applies by a preponderance of the evidence. Id.

The Guidelines permit a four-level increase in a defendant's offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a). "A 'participant'

is a person who is criminally responsible for the commission of the offense, but need not have been convicted." Id. § 3B1.1 cmt. (n.1). Navarrete's base offense level was based on the methamphetamine conspiracy, see id. § 2S1.1(a)(1), but this enhancement must be based on his money-laundering convictions and "not on the underlying offense from which the laundered funds were derived," see id. cmt. (n.2(C)).

Navarrete argues that the district court erred because its application of this enhancement rested on "speculation and conjecture" and because he had "nowhere near five people allegedly under him." We disagree. Several witnesses testified that Navarrete directed them to deposit drug proceeds into the Wells Fargo bank account—including Maria Diaz, Vega, Trevino, Cano-Salgado, and Castanada. The government also produced testimony and documentary evidence that Renteria deposited drug proceeds into the account and that Navarrete directed Karla Diaz to withdraw the drug proceeds after they were deposited in the account. In light of this evidence, the district court's findings that Navarrete was a leader or organizer of the money-laundering conspiracy and that there were five or more participants in the conspiracy were not clearly erroneous. See Pizano, 421 F.3d at 733.

The Guidelines provide for an additional two-level increase if "the defendant receives an adjustment under §3B1.1" and "the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood." USSG § 2D1.1(b)(15)(E). "'Pattern of criminal conduct' means planned criminal acts occurring over a substantial period of time." Id. § 2D1.1, cmt. (n.20(C)); id. § 4B1.3, cmt. (n.1). "'Engaged in as a livelihood' means that (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; and (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period." Id. § 4B1.3, cmt. (n.2).

Navarrete argues that the government failed to allege or prove that he derived income in any twelve-month period that exceeded 2,000 times the then-existing *yearly* minimum wage and that, even if he earned all of the income the government alleged, some of that money "would not represent actual profit as there are product and operational costs to be accounted for." However, 2,000 times the yearly minimum wage is not what is required. The enhancement applies if a defendant derives income in any twelve-month period that exceeds "2,000 times the then existing *hourly* minimum wage under federal law." Id. (emphasis added). At the time of Navarrete's offense, the hourly minimum wage was $7.25. See 29 U.S.C. § 206(a). Accordingly, the government needed to show that Navarrete derived more than $14,500 in income from his drug activity to prove that the enhancement applied. See United States v. Berry, 930 F.3d 997, 999 (8th Cir. 2019).

Maria Diaz and Vega's notebooks indicate that Navarrete's methamphetamine sold for $5,000 to $9,000 per pound. Trevino testified that he paid between $4,000 to $12,500 per pound. Selling 48 pounds of methamphetamine at $4,000 per pound would have resulted in $192,000 in gross revenue over the course of the thirteen-month conspiracy and approximately $177,000 over a twelve-month period. The government further produced evidence that $46,125 went through the Wells Fargo account in 2015 and that $77,780 went through the account in 2016. The district court was not required to offset Navarrete's income to account for operational costs, see Berry, 930 F.3d at 999 (concluding that the term "income," for purposes of this enhancement, "refers to *gross* income, not *net* income"), and it did not clearly err by finding that Navarrete derived more than $14,500 in income from his drug activity.

## V. Conclusion

For all these reasons, we affirm.

_____