# United States Court of Appeals

## For the Eighth Circuit

_____

No. 22-1324

_____

United States of America

*Plaintiff - Appellee*

v.

Nathan Peachey

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Southern

_____

Submitted: October 21, 2022
Filed: March 16, 2023
[Unpublished]

_____

Before KELLY, WOLLMAN, and KOBES, Circuit Judges.

_____

PER CURIAM.

Nathan Peachey was involved in an international scheme to commit wire fraud and money laundering, which included bilking more than $500,000 out of a 100-year-old retired farmer from Lake Norden, South Dakota. Peachey was convicted after a

jury trial of the following offenses: one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349; one count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h); one count of conspiracy to obstruct justice, in violation of §§ 1512(c)(2) and 1512(k); and nine counts of laundering monetary instruments and aiding and abetting, in violation of §§ 1956(a)(1)(B)(i) and 2. The district court[1] sentenced Peachey to 300 months' imprisonment. Peachey appeals, arguing that the evidence was insufficient to support his convictions. We affirm.

## I. Background

Peachey grew up in an Amish community and attended school until the eighth grade. He lived with his wife and their five children in Pennsylvania, where he sold essential oils, wrote dietary plans, and taught home healthcare classes.

Peachey met Lorin Rosier in 2012. Rosier told him that the Federal Reserve Bank had taken $5 trillion that he had intended to use to fund humanitarian projects. Peachey thereafter established an "Ecclesiastical trust" to help Rosier transfer "off-ledger assets" (which Peachey described as "war loot") to "private placement," thus allowing the assets to return "on-ledger" so long as they were used to fund humanitarian work. Peachey became a member of Rosier's group, the Ecclesia, formed "corporation sole" entities related to the Ecclesia, and asked his friend John Winer to serve as an Ecclesia trustee. Peachey and Winer thereafter began recruiting investors, promising a risk-free investment and returns that would be used to fund humanitarian projects.

---

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

Jane Odle served as power of attorney for Marvin Marttila, the above-mentioned South Dakota farmer. Marttila was privately paying for his care at an assisted living facility in 2016, when Peachey persuaded Odle to invest Marttila's savings. Peachey told Odle that the principal would be safe and returned whenever Marttila needed it, causing her to believe that the money would be held in trust for Marttila's continued care. Peachey also claimed that the investment would generate a return and would be used to fund humanitarian projects. Odle wrote three checks to Winer from Marttila's bank accounts in late May and early June of 2016, totaling $562,414.46. The bank placed a hold on an October 2016 wire transfer of $108,000 from Marttila's account to Winer's account and thereafter stopped a check for the same amount that Odle had written to Winer.

Robert Moller was a retired systems engineer living in Arizona in 2016, when Peachey and Winer persuaded him to invest. Peachey explained that Moller's investment would be safe and that half of any return would go to Moller, with the other half funding humanitarian projects. Moller testified that "[m]y money would never be touched. I would never lose a dollar, per Mr. Peachey." Peachey dramatized his self-proclaimed concerns about the 2016 presidential election, telling Moller that "the economy is going to crash, and [he would] wake up the next morning with half of the money in the bank." Peachey promised that if Moller instead invested in the Ecclesia, he "would never lose a nickel." All told, Moller invested nearly $800,000.

Peachey used four bank accounts in connection with the scheme, two located in the United States and two located in Norway. Marttila's and Moller's checks were deposited into accounts held by Winer, who transferred funds to an account that he held jointly with Peachey, who then transferred funds to an account that Peachey alone controlled. Along the way, Marttila's and Moller's money was commingled with that of other investors. Peachey used these accounts to pay for personal expenses ($1.5 million) and to purchase silver ($157,095.50). He also transferred funds ($208,000) to Rosier's partner, Lubova Burkute.

-3-

Peachey moved funds from his American account to a Norwegian account that he held jointly with Burkute. Frederick Arias, who led a sister organization that had recruited investors under the same pretenses as Peachey and Winer, also transferred $5 million into Peachey and Burkute's Norwegian account. Funds were transferred from this account into a second Norwegian account and used to purchase a home ($1.3 million) in Sandvika, Norway, where Rosier and Burkute lived and Peachey often stayed; a Mercedes-Benz ($83,000); and more silver ($2.75 million). Peachey's American and Norwegian accounts were also used to pay for furnishings and renovations ($1.8 million) for the Sandvika home, as well as costs ($66,345) related to shipping silver from Pennsylvania to Norway.

Peachey, Winer, and Rosier were indicted in the District of South Dakota in October 2019. Arias was added as a defendant in October 2020. Peachey and Winer went to trial in November 2021, but Rosier could not be extradited to South Dakota because of his poor health. He died later that year. Arias was released after his arrest in Washington. He failed to appear for his extradition hearing and remains a fugitive.

Over the course of seven days, the jury heard testimony about the scheme from investors, bankers, Norwegian witnesses, agents of the Internal Revenue Service and the Federal Bureau of Investigation, and the defendants themselves. The government presented extensive documentary evidence regarding the bank accounts associated with the scheme. Those documents tracked the deposits, transfers, and withdrawals. The jury also heard recordings in which Peachey incriminated himself. The district court denied Peachey's motion for judgment of acquittal, and the jury returned guilty verdicts on all counts.

## II. Discussion

We review *de novo* the denial of a motion for judgment of acquittal. United States v. Sainz Navarrete, 955 F.3d 713, 718 (8th Cir. 2020). "We must affirm a jury

verdict if, taking all facts in the light most favorable to the verdict, a reasonable juror could have found the defendant guilty of the charged conduct beyond a reasonable doubt." Id. (quoting United States v. Clark, 668 F.3d 568, 573 (8th Cir. 2012)).

Peachey first argues that the evidence was insufficient to support his conviction for conspiracy to commit wire fraud, claiming that the government failed to prove that he "devised or intend[ed] to devise any scheme or artifice to defraud," 18 U.S.C. § 1343, or that he knowingly or intentionally joined a conspiracy, see id. § 1349. According to Peachey, the evidence showed that he worked at Rosier's direction, that he did not know that the funds would not be used for humanitarian projects, and that he never "lied to or intentionally misled any person who signed a [joint-venture] Agreement." Appellant's Br. 15. Peachey also argues that there was no evidence to link him to the members of the Arias-controlled sister organization.

We conclude that overwhelming evidence supports a finding that Peachey engaged in a scheme to defraud. Witnesses including Odle and Moller testified that Peachey promised their principal investment would be safe and that he guaranteed returns that would benefit the investors and pay for humanitarian projects. The government presented evidence that Winer and members of Arias's organization told investors the same thing. Witnesses testified that they relied on these representations when they decided to invest—via check or wire—with Peachey. The government established that Peachey did not intend to safeguard the money or otherwise invest it, presenting evidence that he spent it on things like travel, personal expenses, a luxury home in Norway, renovations, a Mercedes Benz, and silver. No investor realized a return, and no humanitarian project was undertaken. A reasonable juror thus could find that Peachey misrepresented material information for the purpose of inducing individuals to invest their money with him. See United States v. Luna, 968 F.3d 922, 926 (8th Cir. 2020) (To establish a "scheme to defraud" under § 1343, "the government had to prove that: (1) there was a 'deliberate plan of action' or 'course

-5-

of conduct' to hide or misrepresent information; (2) the hidden or misrepresented information was material; and (3) the purpose was to get someone else to act on it.").

The evidence also supports a finding that Peachey knowingly and intentionally joined the wire-fraud conspiracy. See id. ("Even if a scheme to defraud existed, the government still had to establish that [the defendants] played a role in it."). Rosier may have been the conspiracy's mastermind and its primary beneficiary, but Peachey worked closely with him, recruited investors, managed Winer, and spent investor funds lavishly on himself, Rosier, and Burkute. The jury was free to reject Peachey's contentions that the Sandvika home served as a parsonage, that the expenditures were merely costs associated with running a humanitarian organization, and that Peachey somehow believed that the funds were being used for humanitarian work. Moreover, in light of the records showing a transfer of $5 million from Arias's account to one held by Peachey and the recording of Peachey describing Arias's organization as a "sister Ecclesiastical organization," a jury could reasonably find that Arias and his associate were part of the same conspiracy as Peachey, Winer, and Rosier.

Peachey next argues that the evidence was insufficient to support his convictions for conspiracy to launder monetary instruments and for laundering monetary instruments and aiding and abetting. As relevant to Peachey's argument, § 1956(a)(1)(B)(i) requires proof that the defendant conduct a financial transaction "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." Peachey claims that there was no concealment because his name "was on nearly every bank account and corporation sole alleged to have been used to transfer or hold funds" and the Sandvika home,

Mercedes Benz, and silver "were all purchased in the open, with no apparent effort to conceal their ownership." Appellant's Br. 17–18.

Peachey misreads § 1956(a)(1)(B)(i):

> The statute does not require that there be any intention or design to conceal the identity of the person dealing with the property. It requires, instead, that a defendant know that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

United States v. Norman, 143 F.3d 375, 377 (8th Cir. 1998). The funds transferred between Winer's and Peachey's accounts were the proceeds of specified unlawful activity, *i.e.*, the wire-fraud conspiracy. By moving the victims' investments from account to account, commingling it with other victims' investments, and converting those investments into the form of the Sandvika home, the Mercedes Benz, and the silver, Peachey "made it more difficult for the true owner of the money to trace what had happened to it." Id. "Under our cases, this is sufficient to make out a violation of the statute." Id.; see United States v. Dvorak, 617 F.3d 1017, 1023 (8th Cir. 2010) ("[T]he question in this case is whether the circumstances surrounding these withdrawals can support a jury verdict that the withdrawal was designed to conceal the location of the funds.").

With respect to his conviction for conspiring to obstruct justice, Peachey claims that the evidence was insufficient because no one testified that Peachey or his co-conspirators prevented any witness from cooperating with law enforcement or from testifying before the grand jury. The statute does not require that the conspiracy be successful in its obstructive conduct: it also prohibits attempts to obstruct, influence, or impede any official proceeding. 18 U.S.C. § 1512(c)(2). Peachey does not dispute that he contacted victims and witnesses to advise them that federal authorities and the

federal grand jury lacked authority over his organizations. Nor has Peachey challenged the evidence that he instructed Winer to "give zero information" to authorities regarding Marttila's bank transactions, that he falsely testified before a Norwegian court, or that he filed a frivolous lawsuit against federal prosecutors and federal agents. We conclude that sufficient evidence supports Peachey's conspiracy-to-obstruct-justice conviction.

Throughout his brief, Peachey points to so-called joint-venture agreements that he had investors sign, seemingly arguing that these documents gave him free rein to spend their money however he saw fit. He repeatedly argues that the evidence failed to show any breach of these agreements. This is not a breach of contract case, however, and, as recounted above, the government amply proved each of the counts of conviction. To the extent that Peachey argues that he and another defense witness should have been believed, it was within the jury's province to determine witness credibility. See, e.g., United States v. Ramirez-Martinez, 6 F.4th 859, 868 (8th Cir. 2021). We discern no reason to disturb that finding on appeal.

The judgment is affirmed.

_____